**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | Crim. No. 15-567 (KM) |
| v. | |
| **Margaret TIANGCO, a/k/a "Greta"** | **OPINION** |

This matter comes before the Court on the post-trial motion of defendant Margaret Tiangco for a judgment of acquittal, pursuant to Fed. R. Crim. P. 29(c), or in the alternative for a new trial, pursuant to Fed. R. Crim. P. 33. (ECF no. 180) I have considered the proffered grounds separately and in combination. For the reasons expressed herein, the motion will be denied.

I.     **Procedural Background**

On October 29, 2014, the defendant, Margaret Tiangco, a/k/a "Greta," was arrested on a criminal complaint that charged her and eleven codefendants with a single count of conspiracy to distribute and possess with intent to distribute 50 grams or more of methamphetamine, in violation of 21 U.S.C. § 846. (ECF nos. 1, 86) On November 2, 2015, Ms. Tiangco was charged in a two-count indictment. (ECF no. 132) Count 1 charged that "[f]rom in or about January 2013 through in or about July 2014" Ms. Tiangco was part of a conspiracy to distribute and possess with intent to distribute 50 grams or more of methamphetamine, in violation of 21 U.S.C. § 846. Count 2 charged that, on April 29, 2014, Ms. Tiangco distributed and possessed with intent to distribute 50 grams or more of methamphetamine, in violation of 21 U.S.C. § 841(a) and (b)(1)(A).

Ms. Tiangco moved to dismiss Count 1 because the unexcluded time between arrest on the complaint and the filing of the indictment added up to 36 days, in excess of the 30 day limit imposed by the Speedy Trial Act, 18 U.S.C. §

1

3161(b).[1] On April 13, 2016, I granted the motion for reasons expressed on the record, and dismissed Count 1 without prejudice (ECF no. 148)

On April 25, 2016, the grand jury returned a Superseding Indictment. (ECF no. 150) It was identical to the original Indictment, except that the time frame of the Count 1 conspiracy had been expanded greatly, from 2013–14 to "[f]rom in or about 2004 through in or about July 2014."

Ms. Tiangco, represented by Paulette L. Pitt, Esq., went to trial. Trial occupied six days from July 5 through 12, 2016. On July 12, 2016, the jury entered a verdict of guilty on both counts of the Superseding Indictment. (ECF no. 176) In answers to special interrogatories, the jury found that each count involved 50 grams or more of methamphetamine, as charged. (ECF no. 178)

On July 25, 2016, Ms. Tiangco filed a motion for judgment of acquittal, under Fed. R. Crim. P. 29(c), or in the alternative for a new trial, under Fed. R. Crim. P. 33. (ECF no. 180)[2] Ms. Tiangco has submitted a brief ("Tiangco Br.", ECF no. 183); the government has submitted a response ("Gov't Br.", ECF no. 185); and Ms. Tiangco has submitted a reply ("Tiangco Reply Br.", ECF no. 186).

## II.    Standards Under Rules 29 and 33

Under Rule 29, a defendant who asserts that there was insufficient evidence to sustain a conviction shoulders "a very heavy burden." *United States v. Anderson,* 108 F.3d 478, 481 (3d Cir. 1997) (quoting *United States v. Coyle,*

---

[1]    The delay seems to have been attributable to short hiatuses between pre-Indictment consent continuance orders based on the interests of justice and ongoing plea negotiations. *See* 18 U.S.C. § 3161(h)(8); ECF nos. 103, 113, 124, 130 (continuance orders consented to by defendant and containing findings by Magistrate Judge that continuance was in the interests of justice). For this reason and others, I orally ruled that the dismissal would be without prejudice.

[2]    The deadlines for Rule 29 and 33 motions are coordinated. "A defendant may move for a judgment of acquittal, or renew such a motion, within 14 days after a guilty verdict or after the court discharges the jury, whichever is later." Fed. R. Crim. P. 29(c). "Any motion for a new trial grounded on any reason other than newly discovered evidence must be filed within 14 days after the verdict or finding of guilty." Fed. R. Civ. P. 33(b)(2). Ms. Tiangco's Rule 29 and Rule 33 motions were filed on July 25, 2016, thirteen days after the jury rendered its verdict and was discharged, and were therefore timely.

63 F.3d 1239, 1243 (3d Cir. 1995)). The court cannot substitute its judgment for that of the jury. Hence it must view the evidence, and all reasonable inferences therefrom, in the light most favorable to the prosecution, resolving all credibility issues in the prosecution's favor. *United States v. Hart*, 273 F.3d 363, 371 (3d Cir. 2001); *United States v. Scanzello*, 832 F.2d 18, 21 (3d Cir. 1987). Having done so, the court must uphold the conviction if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original). *Accord United States v. Caraballo-Rodriguez*, 726 F.3d 418, 430-31 (3d Cir. 2013) (en banc) (reaffirming principle and reversing a line of drug conspiracy cases that seemingly undermined it); *United States v. Silveus*, 542 F.3d 993, 1002 (3d Cir. 2008) (issue for trial or appellate court is "whether any rational trier of fact could have found proof of guilt beyond a reasonable doubt based on the available evidence"); *United States v. Smith*, 294 F.3d 473, 476 (3d Cir. 2002).

The standard under Rule 33 is more general; a court "may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33. When a defendant seeks a new trial claiming that the verdict was against the weight of the evidence, the court's review is less restricted than it is under Rule 29. "However, even if a district court believes that the jury verdict is contrary to the weight of the evidence, it can order a new trial 'only if it believes that there is a serious danger that a miscarriage of justice has occurred—that is, that an innocent person has been convicted.'" *United States v. Silveus*, 542 F.3d at 1004-05 (quoting *United States v. Johnson*, 302 F.3d 139, 150 (3d Cir. 2002)). "Such motions are not favored and should be 'granted sparingly and only in exceptional cases.'" *Id.* at 1005 (quoting *Gov't of Virgin Islands v. Derricks*, 810 F.2d 50, 55 (3d Cir. 1987) (citations omitted)). A Rule 33 motion may also be based on an alleged error or combination of errors at trial. Borrowing the appellate concept of harmless error, district courts have held that a new trial will be ordered when it is "reasonably possible that such error,

or combination of errors, substantially influenced the jury's decision." *United States v. Crim,* 561 F. Supp. 2d 530, 533 (E.D. Pa. 2008) (citing *U.S. v. Copple,* 24 F.3d 535, 547 n. 17 (3d Cir. 1994)), *aff'd,* 451 F. App'x 196 (3d Cir. 2011); *accord United States v. Bryant,* Crim. No. 07-267, 2009 WL 1559796 at *6 (D.N.J. May 28, 2009). I remain cognizant, however, that the Rule 33 standard is both discretionary ("may") and flexible ("interest of justice").

## III.   **Discussion**

Because the grounds for the motion are focused and particular, I dispense with an overall statement of the evidence at trial. Suffice it to say that it was persuasive and overwhelming. Ms. Tiangco acted as a broker, transporting or sending methamphetamine from a California supplier, Javier Diaz, to New Jersey distributors—originally Arlon Macatangay, and later John Freehauf. The evidence included the testimony of three coconspirators (Diaz, Freehauf, and Kristie Navarro); video of Ms. Tiangco at a UPS center sending a package containing methamphetamine (later intercepted by the agents in New Jersey); telephone calls and text messages arranging shipments; evidence that Ms. Tiangco was pulled over in Missouri with a pound of methamphetamine in her car; Navarro's eyewitness account of deliveries by Tiangco; a post-arrest letter in which Tiangco asked Freehauf to sign a false statement that she was not involved in the distribution conspiracy; and more.

### A. **Evidence of Missouri Arrest**

Ms. Tiangco here revives her objection to the admission of evidence of her arrest near Joplin, Missouri, on September 15, 2009, with approximately one pound of methamphetamine in her car. On June 29 and July 6, 2016, I held a suppression hearing after which I found, based on the testimony of the officers involved, that the traffic stop was proper and that Ms. Tiangco made self-incriminatory statements after proper *Miranda* warnings.[3] Ruling orally, I

---

[3]   Initially charged with possession with intent to distribute, she pled guilty in Missouri to a reduced charge of possession of methamphetamine. The conviction itself, however, was not ultimately offered in evidence.

denied suppression and permitted this evidence to be admitted conditionally, subject to connection to the conspiracy. (*See* Order, ECF no. 171)

At trial, the jury heard testimony from two of the police officers involved in the 2009 Missouri traffic stop and arrest. (7/7 Tr. at 73, 107) Officer Blane Cornelius described the stop for speeding and the consent search that followed. That search yielded the following, documented by photographs placed in evidence: a candy tin containing a glass methamphetamine smoking pipe, and a backpack containing a gallon ziplock bag approximately 1/3 full of methamphetamine. (7/7 Tr. 86–90; *see also* 110–11; Exhibs. 6B-1, 6B-2, 6B-5, 6B-7, 6B-10) Officer Schanot testified that this "large quantity" of the drug field-tested positive for methamphetamine. (7/7 Tr. at 111–12). He also introduced a recording of Ms. Tiangco's statement to the police, in which she admitted possession of the methamphetamine and stated that she was en route to New Jersey. (Exhib. 6A (transcript)). Also read into evidence was a stipulation that in 2014, Ms. Tiangco admitted that she knowingly possessed the methamphetamine that was recovered from the car in Missouri. (7/7 Tr. at 131–33)[4]

Ms. Tiangco argues that this evidence of her transportation of methamphetamine in 2009 should be analyzed as extrinsic "prior bad acts" evidence. *See* Fed. R. Evid. 404(b). True, this evidence would have been extrinsic to Count 1 of the *original* Indictment, which was confined to the 2013–14 period. But the original Indictment created no vested entitlement to that time frame. When the government superseded the Indictment, it extended the beginning of the conspiracy period back to 2004. At trial, it introduced ample evidence of methamphetamine dealing throughout that period, supporting the expanded time frame. (*See, e.g.,* Testimony of Javier Diaz, 7/7 Tr., *passim.*)

---

[4]     These statements were excerpted from Ms. Tiangco's Missouri guilty plea allocution, but the plea and conviction were not placed in evidence.

The arrest in Missouri occurred in 2009, squarely in the middle of the ten-year conspiracy charged in the Superseding Indictment. The acts involved—transportation of methamphetamine obtained from Diaz in California to a recipient in New Jersey—were part and parcel of the conspiracy. This therefore was not extrinsic evidence, but direct evidence of the conspiracy as charged. I do not accept Ms. Tiangco's argument that the government was "getting in the back door what it could not get in the front door." This was evidence of the charged offense, brought in through the "front door" of direct relevance under Rules 401 and 402. Rule 404(b) has no application to evidence that is intrinsic to a charged conspiracy. *See United States v. Cross*, 308 F.3d 308, 320 (3d Cir. 2002) ("Rule 404(b) 'does not extend to evidence of acts which are 'intrinsic' to the charged offense") (quoting Fed. R. Evid. 404(b) Advisory Committee Note); *United States v. Gibbs*, 190 F.3d 188, 217 (3d Cir. 1999) (intrinsic evidence exception to Rule 404(b) applies "[i]n cases where the incident offered is part of the conspiracy alleged in the indictment.") (quoting 22 Charles A. Wright & Kenneth W. Graham, Jr., Federal Practice and Procedure, § 5239, at 450-51 (1978)).

To her main objection, Ms. Tiangco adds a couple of subordinate ones. The prosecution, she says, "inaccurately and misleadingly referred to the Missouri case as a possession with intent to distribute case rather than a possession case." (Tiangco Br. at 6) Not quite. Here is the full exchange at the pages cited by Tiangco:

Q    You don't have to go into detail about what Mr. Santiago [the other person in the car with Tiangco] told you, but it's correct that there were basically two suspects in terms of who was – *who was in a position to possess with intent to distribute the methamphetamine that was inside Miss Tiangco's car*, correct?

A    That's correct.

Q    That's Miss Tiangco and Mr. Santiago?

A    Correct.

Q    Based upon your – the information that you gathered there at the scene, did you have a reasonable assurance, within your

own opinion, that *Mr. Santiago was not the possessor* of the methamphetamine?

A       Yes.

Q       And how did you arrive at that conclusion without the specifics? How did you arrive at that conclusion?

A       Based on the process of conducting the interviews, we spoke to Tiangco first, and then we talked with Santiago. And based on the two information we received from those interviews, we brought Miss Tiangco down for a third interview. And at that point we addressed questions a little bit harder because in our opinion we felt that *she was the true possessor* of the methamphetamine.

(7/7 Tr. at 128:23–129:19) (emphasis added to highlight references to possession).

First of all, this exchange was not a description of the Missouri *charge* at all; it was a description of the Missouri *events*.[5] Second, the question was not aimed to elicit whether the possessor of the drug intended to distribute it; it was aimed at identifying which of the car's two occupants was the possessor of the drug. The fleeting, factually accurate reference to intent to distribute could not have prejudiced the jury, even if it had not been supported by evidence.

And it was supported by evidence. Third, and finally, the jury saw and heard overwhelming evidence of intent to distribute. The jury saw photographs of a large quantity of methamphetamine. (Exhibs. 6B-5, 6B-10) They heard evidence that a typical user would consume a gram or less, and that it would take one person perhaps a year to consume a pound.[6] (7/8 Tr.at 10:16–25, 33:7–13) They heard testimony that Ms. Tiangco was then a regular distributor of supplier Javier Diaz's product in pound quantities, of which this was one. (7/7 Tr. at 10–17, 27, 31, 37–38) They heard testimony that she intended to deliver it to New Jersey. (7/7 Tr. at 31:9–19) They heard her own post-arrest

---

[5]       It seems that Ms. Tiangco was initially charged with a state offense of possession with intent to distribute, although she later pled guilty to a reduced possession charge. That guilty plea to a lesser charge, which was not placed in evidence by either side, is the basis for Tiangco's argument here.

[6]       A pound equals 453.6 grams.
http://m.wolframalpha.com/input/?i=1+pound+to+grams&x=0&y=0

statement admitting that she took (stole, she said) the package because she wanted to make some money to redeem herself in her mother's eyes. (Exhib. 6A (transcript) at 30)[7] So intent to distribute would be a permissible, indeed nearly inescapable, inference.

Finally, Ms. Tiangco argues that there was no evidence that the methamphetamine seized in Missouri originated with co-conspirator Javier Diaz, or that it weighed one pound.

There was ample evidence from which the jury could conclude that Diaz was the source of the Missouri methamphetamine. Diaz testified credibly and persuasively to a long course of methamphetamine dealings with Ms. Tiangco, beginning in 2005, at times involving 10 to 20 pounds per month. (7/7 Tr. at 10–16) Diaz admitted that it was he who supplied the crystal methamphetamine that was seized from Tiangco in Missouri in 2009. (*Id.* at 17, 27, 31, 37–38) Indeed, he testified that he was Ms. Tiangco's only supplier. She was pulled over by the police in Missouri just two days after she left his house in Los Angeles with the drug. (*Id.* at 37:14, 38:1)

Ms. Tiangco insists that Diaz's testimony that the drug was his product was proven to be "inaccurate." (Tiangco Br. 6, citing 7/7 Tr. at 37, Exhibit 6B-2) Diaz, however, inspected the photograph of the drugs and testified with certainty that the depicted methamphetamine was his. The only apparent discrepancy was that the photograph did not show any newspaper, which he typically included as an inner wrapper. (7/7 Tr. at 37:17–20) Ms. Tiangco elicited this rather minor, explainable discrepancy on cross examination.[8] The

---

[7]     Ms. Tiangco then stated that she was "sharing," not "selling" (*id.* at 32–33), but seemingly wavered, also referring to "crash[ing] somebody's market" or making money in New Jersey (*id.* at 34, 35). Distribution, however, does not require a sale or exchange. *See infra.*

[8]     For example, in her statement to the Missouri police, Tiangco admitted that she had personally used some of the methamphetamine. (Exhib. 6A at 33 (transcript)) That could account for some disturbance of the inner packaging. Or Diaz could have deviated from his usual practice of including newspaper in the packaging.

jury, exercising its fact finding function, could permissibly have nevertheless credited Diaz's admission that he was the source.

As to the weight, it is true that the police officers testified only that it was a "large quantity" (and the jurors could perhaps have judged that for themselves from the photograph). (7/7 Tr. at 111:15; Exhibs. 6B-5, 6B-10)[9] Diaz testified specifically that he supplied Ms. Tiangco with one pound on that occasion. (7/7 Tr. at 17, 31, 37–38; *see also id.* at 27 (stating, in relation to the photograph of the Missouri methamphetamine, "I was a hundred percent the person that shipped it out to her.")) And Diaz—drawing on his long experience as a methamphetamine dealer—looked at the photograph of the methamphetamine seized from Tiangco's car and identified it as "[a] pound of crystal meth." (7/7 Tr. at 11) More generally, during this period, Diaz dealt with Tiangco in pound quantities; only later did the amounts decrease. (*id.* at 22:8–10 ("Half a pound, four ounces. It wasn't a pound anymore....."))

More generally, of course, the jury did not *need* to find that this particular transaction involved a pound of methamphetamine. In special interrogatories, they were called upon only to state whether the conspiracy involved at least 50 grams of methamphetamine. There was overwhelming evidentiary support for the jury's answer of "yes" to that question, and Ms. Tiangco does not directly challenge it in this motion.

Ms. Tiangco's contentions come nowhere near a Rule 29 showing that a judgment of acquittal is required. Nor do they raise the slightest issue, under Rule 33, that there was any error requiring a new trial for reasons of justice and fairness.

## B. Venue

---

[9]     When questioning Tiangco, one of the officers estimated the quantity as at least one pound. (Exhib. 6A (transcript) at 23)

Count 2 alleges that on April 29, 2014, Ms. Tiango did knowingly and intentionally distribute and possess with intent to distribute 50 grams or more of methamphetamine, in violation of Title 21, United States Code, Sections 841(a) and (b)(1)(A) and Title 18, United States Code, Section 2. She argues that Count 2 must be dismissed because venue was not properly laid in New Jersey. I disagree. Venue was proper under a general "continuing offense" theory. *See United States v. Uribe*, 890 F.2d 554, 558–59 (1st Cir. 1989). Alternatively, venue was proper because Ms. Tiangco remained in constructive possession of the package while it was in New Jersey. *See United States v. Boney*, 572 F.2d 397, 400–02 (2d Cir. 1978).

The U.S. Constitution, Article III, § 2, cl. 3, requires that trials of crimes be held "in the State where said crimes shall have been committed." The Sixth Amendment provides for trial by jury "of the State and district wherein the crime shall have been committed." And the Federal Rules provide that "[u]nless a statute or these rules permit otherwise, the government must prosecute an offense in a district where the offense was committed." Fed. R. Crim. P. 18. Where venue is contested, "[t]he Government bears the burden of proving venue by a preponderance of the evidence and venue must be proper for each count of the indictment. *United States v. Perez*, 280 F.3d 318, 328–30 (3d Cir. 2002)." *United States v. Root*, 585 F.3d 145, 155 (3d Cir. 2009).[10]

---

[10]   To aid in appellate review, I summarize the record regarding the defendant's preservation of the issue.

> [W]here the indictment alleges venue without a facially obvious defect, if (1) the defendant objects to venue prior to or at the close of the prosecution's case- in-chief, (2) there is a genuine issue of material fact with regard to proper venue, and (3) the defendant timely requests a jury instruction, venue becomes a jury question and the court must specifically instruct the jury on venue.

*United States v. Taylor*, 559 F. App'x 122, 126–27 (3d Cir.), *cert. denied*, 135 S. Ct. 125 (2014) (quoting *Perez*, 280 F.3d at 334).

Ms. Tiangco's Rule 29 motion for a judgment of acquittal at the close of the government's case included an argument that venue of Count 2 was inappropriate. I denied that motion orally. This seemed to me to be a legal dispute, not a factual one. Nevertheless, because the issue of venue was disputed, out of caution I submitted it to the jury for decision. The relevant jury instruction was delivered as follows:

The evidence underlying Count 2 was as follows. John Freehauf testified that he was a methamphetamine distributor in New Jersey and that he was supplied with product by Ms. Tiangco. On April 27–29, 2014, the agents intercepted a series of text messages between Tiangco and Freehauf that indicated she was sending a couple of ounces of methamphetamine to Freehauf in New Jersey, *via* a shipment to her brother in Long Branch, New Jersey. (7/6 Tr. at 27–29; 7/8 Tr. at 37:6–38:6, 40:1–41:18; Exhib. 4A)

The government retrieved business records from UPS, as well as surveillance footage of a transaction at the counter of UPS Store #321 in Las Vegas, Nevada. That counter transaction occurred at approximately 3:46 p.m. on April 29, 2014. (Exhibs. 1A, 1B, 1C, 1D) Records confirm that, at that time and date, a package bearing tracking number 1C10598X0190432694 was

---

### VENUE

The Superseding Indictment alleges that some act in furtherance of the offenses charged occurred here in New Jersey. There is no requirement that all aspects of the offenses charged take place here in New Jersey. But for you to return a guilty verdict, the Government must convince you that some act in furtherance of the crimes charged, took place here in New Jersey.

Regarding Count Two, distributing drugs is a continuing offense. Venue is proper in any location where the distribution began, continued or was completed. There is no requirement that all aspects of the offense charged took place here in New Jersey.

Unlike all the elements that I have described, this fact only has to be proved by a preponderance of the evidence. This means the government only has to convince you that it is more likely than not that some act in furtherance of the crimes charged took place here.

Remember that the government must prove all the other elements I have described beyond a reasonable doubt.

---

This is essentially Model Third Circuit Jury Instruction (Criminal) 3.09 with the second paragraph ("Regarding Count Two…") inserted.

The defendant did not object to the language of this charge, which the parties worked out in conference. Error, assuming any is asserted, was surely harmless. The parties do not contest the venue-creating facts—*i.e.,* the defendant's sending of the package from Las Vegas and its interception in New Jersey before it reached the intended recipient. Rather, Ms. Tiangco argues here, as she did at the close of the government's case, that those facts do not suffice as a matter of law to support venue in this District.

dropped off at the UPS store; that the shipping account was that of "Gret Tiangco"; and that the designated recipients were Alain Tiangco and Melissa M in Long Branch, New Jersey. (7/6 Tr. at 40–41; Exhib. 1D) The surveillance video, in color and of good quality, showed that Ms. Tiangco and a companion sealed and dropped off that package at the counter of the UPS store. (7/6 Tr. 42; Exhib. 1B)

In a text message dated April 30, 2014, Tiangco sent Freehauf the package's UPS tracking number, 1C10598X0190432694. (7/6 Tr. at 29; 7/8 Tr. at 44; Exhib. 4A) In another text message exchange that day, Tiangco told Freehauf the package was already in New Jersey, that it would be at her brother's house in Long Branch by 10 a.m., and that Freehauf should hurry to pick it up because Ramon (a friend) was in need of the drug. (7/8 Tr. at 45; Exhib. 4A)

As the request of the federal agents, however, UPS detained the package at their distribution hub in Tinton Falls, New Jersey. The agents in New Jersey picked up the package from UPS. (7/6 Tr. at 30) Pursuant to a search warrant, they opened the UPS package. (7/6 Tr. at 30–31) Inside was approximately 55 grams of nearly pure methamphetamine. (*See* Exhibs. 15, 1, 1A, 2A) The package bore tracking number 1C10598X0190432694. It identified Ms. Tiangco as the sender, and it bore her phone number and return address. (*Id.*) The package was addressed to Ms. Tiangco's brother, Alain Tiangco (as well as Melissa M), in Long Branch, NJ. (7/6 Tr. at 44)

Because the package was intercepted, it never reached its addressee, Alain Tiangco, or Freehauf. Both Freehauf and Kristie Navarro testified to their considerable efforts to locate the missing package. (7/8 Tr. 44–48, 53, 59–62, 101–02) Those efforts involved text mail exchanges between Freehauf and Ms. Tiangco, in which Tiangco initially blamed her brother. (7/8 Tr. 47–48)

Ms. Tiangco stresses that this evidence demonstrates that she acted wholly within the State of Nevada. She performed no act of distribution or possession with intent to distribute in New Jersey in connection with the April

12

29, 2014 package. It follows, she argues, that venue for Count 2 could not properly be laid in the District of New Jersey.[11]

Venue must be assessed in relation to the actions made unlawful by the statute: "[T]he locus delicti must be determined from the nature of the crime alleged and the location of the act or acts constituting it." *United States v. Cabrales*, 524 U.S. 1, 6, 118 S. Ct. 1772, 1776 (1998) (quoting *United States v. Anderson*, 328 U.S. 699, 703, 66 S. Ct. 1213 (1946)). Count 2 was charged as, and could be committed by, either actual distribution of methamphetamine or possession of methamphetamine with intent to distribute it. *See* 21 U.S.C. § 841(a)(1).[12] Under 18 U.S.C. § 2 (cited in Count 2, although probably superfluously so), a person who causes, or aids and abets, commission of the offense is also punishable as a principal.

To "distribute" a drug is to "deliver" possession of it to another. 21 U.S.C. § 802(11). To "deliver" means "the actual, constructive, or attempted transfer of a controlled substance . . . whether or not there exists an agency relationship." 21 U.S.C. § 802(8). It does not require a sale or exchange. *United States v. Coady*, 809 F.2d 119, 124 (1st Cir.1987); *United States v. Ramirez*, 608 F.2d 1261, 1264 (9th Cir.1979). *See also United States v. Navarro*, 476 F.3d 188, 196 (3d Cir. 2007) (superseded on other grounds by amendment to U.S.S.G. § 2K2.1(b)). "Possession" includes physical custody. It also encompasses "constructive possession," *i.e.,* "dominion and control" in the sense of "the ability to reduce an object to actual possession." *United States v. Martorano*, 709 F.2d 863, 869 (3d Cir. 1983); *see also United States v. Jenkins*, 90 F.3d 814, 817 (3d Cir. 1996). The jury was so charged.

---

[11]    Ms. Tiangco makes no venue argument with respect to Count 1, which charges conspiracy. "In the context of a conspiracy charge, 'venue can be established wherever a coconspirator has committed an act in furtherance of the conspiracy.'" *United States v. Auernheimer*, 748 F.3d 525, 533 (3d Cir. 2014) (quoting *Perez,* 280 F.3d at 329). The concession is apt; there was evidence of many conspiratorial acts, including distributions of methamphetamine, in New Jersey.

[12]    *I.e.,* possession with the necessary intent to distribute. Because the evidence of intent to distribute was more than adequate, I set the intent issue aside for purposes of this venue discussion.

The government concedes that all of Ms. Tiangco's physical actions with respect to Count 2 took place in Nevada. They point out, however, that a continuing offense "begun in one district and completed in another, or committed in more than one district, may be inquired of and prosecuted in any district in which such offense was begun, continued, or completed." 18 U.S.C. § 3237(a); *United States v. Auernheimer,* 748 F.3d 525, 533 (3d Cir. 2014). And "possession with intent to distribute a controlled substance is a continuing offense." *United States v. Hull,* 456 F.3d 133, 146 (3d Cir. 2006) (quoting *United States v. Zidell,* 323 F.3d 412, 422 (6th Cir. 2003)).[13] It follows, then, that "venue for the [possession with intent to distribute] crimes prosecuted in this case was proper in any district where the crimes began, continued or were completed." *United States v. Georgacarakos,* 988 F.2d 1289, 1293 (1st Cir. 1993); *accord United States v. Ogbuehi,* 1995 WL 112991 at *4 (E.D. Pa. March 14, 1995). "To satisfy the terms of this statute, it is not essential that the defendant ever have been physically present in the district in question, so long as 'the offense continued into' this district." *Zidell, supra* (quoting *United States v. Medina,* 992 F.2d 573, 587 (6th Cir. 1993)).

I am guided by *United States v. Uribe,* 890 F.2d 554, 558–59 (1st Cir. 1989). There, a cocaine purchaser named Rash placed a telephone call to a supplier in Warwick, Rhode Island to order a kilogram of cocaine. The supplier obtained a kilogram from his source in Rhode Island. The supplier then traveled to Worcester, Massachusetts, where he delivered the package to Rash. Rash was named in a substantive count of possession with intent to distribute, in violation of 21 U.S.C. § 841(a)(1), brought in the District of Rhode Island. Rash contested venue, objecting that he "never had possession of the

---

[13]    *Zidell* collected cases, including *United States v. Turner,* 936 F.2d 221, 226 (6th Cir. 1991) (stating that drug trafficking offenses "are not completed until the drugs reach their final destination, and [that] venue is proper in any district along the way" (internal quotations and citation omitted)). *But see United States v. Anudu,* 471 F.3d 471 (Table), 1996 WL 67214 (4th Cir. Feb. 16, 1996) (distinguishing distribution from possession for these purposes).

contraband, actual or constructive, within the district" (*i.e.*, Rhode Island). *Id.*
at 558. The Court of Appeals, per Selya, J., demurred:

> To be sure, more than a de minimis connection is required-but
> here, the triangular nexuses between the accused, the offense
> charged, and the forum are solidly conjoined. Rash placed a call to
> Rhode Island to arrange for the purchase. The cocaine was
> thereafter given to a courier in Rhode Island and brought to
> Massachusetts in response to the "order" which Rash had placed.
> The sequence was continuous and unbroken. This was more than
> enough to allow venue to be laid in Rhode Island on count three.

*Id.* at 559.[14] A similar case was *Ogbuehi, supra,* in which a defendant ordered
heroin by phone from his confederates in Philadelphia, who delivered it to him
in Maryland. Venue for a possession count was found proper in the Eastern
District of Pennsylvania. 1995 WL 112991 at *5.

Ms. Tiangco sealed and deposited a package with UPS for delivery in New
Jersey. This process was underway and ongoing, within the State of New
Jersey, until the agents diverted the package. Under *Uribe,* because possession
with intent to distribute is a continuing offense, venue is proper along the way
until the package arrives at its destination.[15]

---

[14]     *Uribe,* like the earlier case of *United States v. Brunty,* 701 F.2d 1375, 1382 (11th
Cir. 1983), analogized to the offense of drug importation, 21 U.S.C. § 952(a), which
begins when the narcotics enter the United States, but continues until they reach
their final destination, so that venue is proper in any district along the way. *See* 18
U.S.C. § 3237(a) (providing that offenses "involving . . . the importation of an object or
person into the United States" are continuing offenses which may be prosecuted in
any district through which the object moves).

[15]     Although I focus here on possession with intent to distribute, I also think that
the definitions of distribution and delivery, *see supra,* are broad enough to encompass
not just a physical handoff but the entire process of sending a package to another
state by commercial courier. Now it is true, as Ms. Tiangco says, that the package was
held by UPS in Tinton Falls, New Jersey, and diverted to the federal agents, and
therefore never reached the intended addressee. The statutory definition of "delivery,"
however, encompasses an "attempted" transfer. 21 U.S.C. § 802(8). And in any event
the package containing the drugs got to *somebody* in New Jersey; the package was
delivered from Ms. Tiangco to UPS personnel in New Jersey, as she knew and intended
it would be. That in itself could be considered a distribution. Of course the UPS
personnel did not know there were drugs in the package, but 21 U.S.C. § 841(a)(1)
contains no scienter element for the *recipient* of the distribution or delivery.

Alternatively, Ms. Tiangco remained in constructive possession of the package while it was in New Jersey. Third Circuit precedent is lacking, but the United States Court of Appeals for the Second Circuit considered a similar issue in *United States v. Boney*, 572 F.2d 397, 400–02 (2d Cir. 1978). There, Boney sent a package of methaqualone by air freight from Texas, and the package was intercepted by government agents at JFK Airport in the Eastern District of New York. Like Tiangco, Boney objected to venue on the grounds that she never left Texas and performed all of her alleged criminal acts there.[16] Boney added that "because the contraband was actually picked up at the airport by government agents, who had it under their control, she could not have been in constructive possession" in the Eastern District of New York, and that therefore her motion for acquittal should have been granted. *Id.* at 400-01.

The Second Circuit rejected defendant's arguments based on the law governing commercial transactions, bills of lading, passage of title, and the like. Such concepts, it held, were overridden by broader criminal law concepts of possession and culpability. *Id.* at 401. The goal of preventing drug trafficking and the goal of promoting stability in legitimate business transactions, it held, were divergent and did not merit parallel treatment.

Rather, the *Boney* court reasoned, the air freight carrier acted as the agent of Boney as shipper. If, the court explained, the intended recipient "had not appeared to claim the goods, [Boney] could have retrieved them from the carrier. . . . she did not lose possession until the methaqualone was actually delivered. In that sense, the carrier was like any other agent whose possession was constructively that of his principal." *Id.* at 401. Nor was it significant that the intended recipient was in fact a government informer, and that the criminal scheme was therefore doomed to fail:

> A purveyor of drugs charged with possession with intent to
> distribute may be in constructive possession while he negotiates

---

[16]     The court found that Boney had failed to specifically preserve her venue objection as such. 572 F.2d at 400–01. It nevertheless considered her contentions on the merits as a challenge to the sufficiency of the evidence.

> with an undercover agent even though he cannot succeed in the venture. So, too, the fact that the Government agents were in practical control of the drugs before their seizure is of no legal significance. Such control by the Government agents does not, in itself, divest the appellant of constructive possession of the same drugs.

*Id.* at 401–02.

Viewing the facts through the lens of *Boney,* I find that Ms. Tiangco retained dominion, control, and the ability to reduce the package to possession. She thus remained in constructive possession of the package while it was in New Jersey. For this reason, too, venue over the charge of possession with intent to distribute was proper.

Defendant cites a number of cases, chief among them *United States v. Tingle,* 183 F.3d 719 (7th Cir. 1999), which found venue improper as to drug distribution counts. There, however, defendant Tingle had physically delivered a package to a person named Rathers at Tingle's home in Chicago. Rathers then traveled to Wisconsin, where he delivered most of the drugs in the package to a third person, Judon. The court found venue in the Eastern District of Wisconsin to be improper as to Tingle, who had completed the intended act of distribution in Chicago.

It is important to remember, first of all, that the relevant count of that indictment charged Tingle with distribution *to Rathers.* It did not charge possession with intent to distribute. It therefore would have been fruitless to argue that Tingle continued to constructively possess the drug when it was in the hands of Rathers in Wisconsin, or that she was culpable for Rathers's delivery to Judon. So *Uribe* and *Boney,* both involving charges of possession with intent to distribute, are distinguishable right off the bat.

Even as to a distribution charge, however, the facts of *Tingle* are distinguishable. I do not suggest that, where a drug was distributed from one person to another in district #1, a subsequent delivery down the chain of distribution in district #2 would give district #2 venue over the original distribution. But venue over Count 2 here is not based on the happenstance of

a subsequent act of distribution between third parties in New Jersey. Rather, Tiangco committed the drugs to a courier service, an intermediary she chose for the very purpose of having the package delivered to Long Branch, New Jersey (although it only got as far as the UPS facility in Tinton Falls, New Jersey). Thus Ms. Tiangco purposefully engaged in a unitary *interstate* transfer of drugs. That, I think, is sufficient to distinguish *Tingle* and confer venue. *See also* n.15, *supra*.

This is a continuing offense which, although begun elsewhere, continued into this district. A delivery from Tiangco to the New Jersey UPS personnel occurred in New Jersey. An attempted delivery to Tiangco's brother occurred in New Jersey. A possessory offense continued into this district under the principles of *Uribe*. And a constructive possession (coupled with a contemporaneous intent to distribute) occurred in New Jersey under the principles of *Boney*.

Venue as to Count 2 therefore was properly laid in New Jersey. There being no error, there is no basis to enter a judgment of acquittal or order a new trial on Count 2.[17]

---

[17]   Out of caution, and to facilitate appellate review, I will assume *arguendo* that the proofs on Count 2 failed and consider the resulting prejudice, adopting by analogy the test that would apply on appeal:

> When we find reversible error on one or more counts, we consider "whether the presence of the [invalidated] count[s] had any spillover effect sufficiently prejudicial to call for reversal" of the remaining counts. *United States v. Pelullo,* 14 F.3d 881, 897–98 (3d Cir. 1994) (citation omitted).

> The critical factor in any claim of "taint" is the existence of evidence admitted to support the invalid counts that would not be admissible to prove the remaining counts. *United States v. Cross,* 308 F.3d 308, 318 (3d Cir. 2002).

*United States v. Murphy*, 323 F.3d 102, 118 (3d Cir. 2003).

I conclude that vacating the conviction on Count 2 would have little or no practical effect, given Tiangco's conviction on Count 1. The overarching nature of the Count 1 conspiracy implies that the evidence would have been precisely the same even if Count 1 had been tried separately. The Count 2 shipment, even if found to be out-of-state, was unquestionably conduct in furtherance of the conspiracy. The jury therefore could not have been confused or misled into

### C. Voir Dire of Prospective Jurors

Ms. Tiangco asserts that the Court's refusal to ask one of her proposed *voir dire* questions requires acquittal or a new trial. At issue is her Proposed Question 32: "Do you have any opinions or beliefs about Bruce/Caitlyn Jenner?"[18] It was necessary to ask that question, she says, to elicit potential jurors' views on transgender persons. I did not ask the "Jenner" question, but I did address counsel's transgender concerns by orally asking each individual potential juror the following question:

---

considering evidence that did not properly relate to Count 1. It follows that there is little possibility of prejudice or taint from the inclusion of Count 2, even if it were ultimately found invalid.

In addition, the sentences on Counts 1 and 2 would run concurrently as a matter of law, and the offense level will reflect aggregation of all drug amounts involved in the conspiracy. *See* U.S.S.G. §§ 5G1.2(c), 3D1.2(d), 1B1.3. At most, then, reversal of Count 2 would require a reviewing Court to vacate one of the $100 special assessments, which are imposed on a per-count basis. *See* 18 U.S.C. § 3013(a)(2). As the U.S. Court of Appeals for the Fifth Circuit held in a two-count case like this one:

> Where it is clear that a conviction that is being reversed did not cause a district court to impose a harsher sentence on a conviction that is being affirmed, remand for re-sentencing is not necessary. ... We cannot conclude that the attempt count led the district court to impose a harsher sentence on the conspiracy count. Therefore, we do not remand for resentencing, but adjust the special assessment to $100 for Thomas and $100 for Davis.

*United States v. Thomas*, 690 F.3d 358, 372 (5th Cir. 2012). *See also Tingle*, 183 F.3d at 728 ("This will not affect Tingle's sentence, however, for the sentence on this count was to run concurrent with her conspiracy sentence.").

18     "Caitlyn Marie Jenner (born October 28, 1949), formerly known as Bruce Jenner, is an American television personality and retired Olympic gold medal-winning decathlete.... Previously identifying publicly as male, Jenner revealed her identity as a trans woman in April 2015, publicly announcing her name change from Bruce to Caitlyn in a July 2015 Vanity Fair cover story. Her name and gender change became official on September 25, 2015. She has been called the most famous openly transgender woman in the world. From 2015 to 2016, Jenner starred in the reality television series I Am Cait, which focused on her gender transition." https://en.wikipedia.org/wiki/Caitlyn_Jenner.

While I would not ordinarily cite Wikipedia as authoritative, it is probably an accurate reflection of information that is before the public. Considered in that way, it is relevant to the jury selection question.

> One or more of the individuals in this case may identify with a gender other than that with which he or she was born. Would this affect your ability to be fair and impartial?

(Court's Question no. 22)

Voir dire questioning of prospective jurors, pursuant to Fed. R. Crim. P. 24(a), is generally a matter for the court's discretion. If, voir dire examination is conducted by the Court, as is the custom in this District, the Court must permit counsel to propose questions. *Id.* I did accept proposed questions from counsel, and I adopted many of them. At voir dire, I also followed up with additional questions as necessary to develop the venire members' responses. There was no violation of Rule 24 procedures here; I therefore turn to more general standards governing *voir dire.*

"'[V]oir dire' is the appropriate method for inquiry into possible prejudice or bias on the part of jurors, and . . . the procedure used must provide a reasonable assurance for the discovery of prejudice." *Waldorf v. Shuta,* 3 F.3d 705, 709 (3d Cir. 1993) (citing, *inter alia, Gov't of Virgin Islands v. Dowling,* 814 F.2d 134, 139 (3d Cir. 1987)). "In making this determination, we note that the method of conducting the voir dire is left to the sound discretion of the district court. Generally, a district judge need not pursue any specific line of questioning on voir dire. Any method is sufficient provided it is probative on the issue of impartiality." *Id.* at 710. "It is the rare case that the failure to ask a *particular* question has resulted in reversal. However, we have found error and reversed in cases where the district court barred all inquiry into a relevant *subject matter* designed to elicit a disqualifying prejudice." *Butler v. City of Camden,* City Hall, 352 F.3d 811, 816 (3d Cir. 2003) (summarizing civil and criminal case law). Thus, for example, a new trial has been granted where, in a case involving charges of bribery of an IRS agent, the trial court rejected a defendant's request to ask jurors whether they were employed by the IRS, *United States v. Segal,* 534 F.2d 578, 581 (3d Cir. 1976); or where, in an armed robbery case, the court declined to ask whether prospective jurors had been the victim of a robbery, *United States v. Poole,* 450 F.2d 1082 (3d Cir. 1971).

The concerns of juror bias raised in *Poole* and *Segal* were specific and direct. The concerns expressed in Ms. Tiangco's case, however, were diffuse and general. Counsel never claimed that Ms. Tiangco is herself transgender. There were stray references to a "girlfriend," but again no indication whatsoever that that person is transgender. One government witness, coconspirator Benjamin Navarro, was born biologically male but identifies as female, and prefers to be known as Kristie. (7/8 Tr. at 94) Navarro was in a relationship with Freehauf, knew Ms. Tiangco, and participated in the methamphetamine distribution conspiracy. But again, there was no specific indication that anything about the jurors' attitudes toward Navarro might affect their judgment as to Ms. Tiangco's guilt.

Concerns about jurors' attitudes toward transgender persons would therefore seem to apply to Ms. Tiangco only obliquely, if at all. Nevertheless, I entertained the notion that there might be some potential for bias, however unpredictable. I therefore did not refuse to address the *subject matter* of transgender persons; I simply declined to adopt the *particular question* suggested by the defense. *See Butler, supra.*

Defense counsel seems to regard the proposed question about Caitlyn Jenner as the royal road to the jurors' subconscious (or conscious) attitudes. I was not persuaded. I judged that this was not the sole, or even the best, means of uncovering relevant bias. I did, however, grant defense counsel's application to include a question about transgender status.

The question I did ask fully addressed defense counsel's concerns. That I settled on this particular question as a means of addressing the transgender issue was a judgment well within my discretion as the trial judge. Moreover, reviewing the voir dire as a whole, I am satisfied that it was reasonably designed to uncover the prejudices of jurors that would be relevant to identification of a challenge for cause or a basis for a peremptory strike. *See generally Segal, supra; United States v. Salamone,* 800 F.2d 1216, 1225–26 (3d Cir. 1986).

There is no error or likelihood of prejudice requiring a new trial, and certainly no basis for a judgment of acquittal.

### D.   Claimed Errors in the Aggregate

Finally, to be clear, I have considered the defendant's claims of error cumulatively. Individually, they do not raise a substantial possibility of prejudice. Taken together, they likewise do not suggest any prejudice, unfairness, or evidentiary insufficiency that would warrant a new trial or judgment of acquittal.

### CONCLUSION

For the foregoing reasons, the post-trial motion (ECF no. 180) of defendant Margaret Tiangco, a/k/a "Greta," for a judgment of acquittal, pursuant to Federal Rule of Criminal Procedure 29(c), or for a new trial, pursuant to Federal Rule of Criminal Procedure 33, is **DENIED**.  An appropriate Order will be filed with this Opinion.

Dated:  December 5, 2016

**KEVIN MCNULTY**
**United States District Judge**